etc. at all. Ms. Green, good morning. Good morning, Your Honours. Julie Green, may it please the Court. I represent Plaintiff Xiaoyan Ivy Tang. This is a case for sexual harassment and retaliation arising from what the jury could find was an ongoing pattern of behaviour by a superior toward a very new and young vulnerable subordinate, conveying an implicit message of flirtation and sexual invitation that placed the plaintiff in genuine fear for her future and her career at Citizens Bank. The District Court granted summary judgement. I am asking this Court to vacate and remand for a trial. The District Court committed two fundamental errors, and those errors infect the reasoning and they command the opposite result, I submit. The two fundamental errors were that, first of all, the District Court placed itself really in a role that belongs to the jury by assessing the conduct in light of how boorish it felt the conduct was, and making a determination that was a determination that belonged to the jury. And second of all, by ignoring Ms. Tang's retaliation claims which were properly fled and properly raised in the District Court. Let me begin with the sexual harassment claim. There are two fundamental legal principles that inform the analysis of this claim, and I want to bring them to your attention. I know this Court is familiar with its case law. The two principles I think that are most important here are that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances. And the second is that individual acts of harassment should not be taken in isolation. They should be understood as part of a pattern and their cumulative effect must be considered, even if individually any of the single events might not be considered sufficient to meet the legal standard. So what I'd like to do is to walk through the very significant evidence and show you why, contrary to the employer's portrayal, this is not a case of four isolated incidents, two of which were completely non-sexual in nature. This is an ongoing pattern in which all of the conduct, although some of it was indeed non-sexual in nature, was nevertheless based on sex. This is the conduct that the jury could find, based on this evidence, taking it in the light most favorable to the plaintiff. Counsel, as you walk us through that summary judgment record, it would be helpful to me to know whether you are only arguing the hostile environment form of sexual harassment or whether you are also arguing perhaps as an alternative quid pro quo harassment. Because at times in your briefing and looking at your client's arguments to the district court, it appears that both are being argued and yet that labeling quid pro quo never appears in the briefing and your client appearing pro se doesn't use that language. But it does seem to me that as you articulate in your brief at times, you are arguing both forms and that could be very important in terms of how we evaluate whether this claim should survive summary judgment because they are different forms of harassment. So could you initially clarify that point for me? I appreciate your asking that. This is an unusual case in which the claims do have indicia of both. And the courts I think have correctly recognized that those labels may, that there isn't necessarily a clear line between those labels. I don't, the case law doesn't supply me with a clear definition that tells me precisely whether my claim belongs in one box or the requiring an element of threat. You must do X or I will do Y. That is not the claim I'm making to the extent it's understood. That way then my claim would be better understood as a hostile working environment claim. Nevertheless, I think the implicit, the element of implicit invitation and the fear that it created in the plaintiff and the, in fact, the anger, abuse and hostility far disproportionate to any actual performance issues that were under discussion that later resulted after she failed to reciprocate. Those things all follow the pattern of a quid pro quo type of claim, but nevertheless can also constitute hostile working environment. So if you ask, if I'm compelled to tell you it is one or the other, then I hope that answers your question. There is no question in my mind and I think in the case law that creating an environment in which a plaintiff is offended and shocked and frightened does definitely create a hostile working environment even if it bears the shape of a quid pro quo claim in certain senses. So let me walk through the evidence. First of all, I want to stress that although Ms. Tang's evidence of the record, it's hard to parse, I admit it. I've done my best to assemble the evidence in a coherent manner for you, but one thing that I think is easily lost in reading her evidence is the fact that she does assert, and this fact is in the record, that it was more than just the two episodes that I'll address in a moment, the supposed interview in January and the supposed performance meeting in July. There was ongoing conduct. In fact, she was specifically asked at her deposition between the performance meeting in July and the end of the calendar year 2010, what else was there? And she said, he talked about his Thai girls all the time with me. How often did he talk about them? Frequently, she says. She says, and this is very significant, she says, he stared at my body. This is, you'll see this in her declaration. And I bring to your attention the Billings case in which staring alone was held to constitute, to create a hostile working environment. Did they work in the same office physically? He came to her office. She was located at Citizens Bank on State Street here. He was, his office was a home office in Connecticut. He came to the Citizens Bank office once or twice a week, I think is the evidence. He was her supervisor, so two levels above. So he came and it was his group that was located at that location. In terms of time, over what period of time did this staring and all these other instances take place? They first met each other and the harassment began right at the outset in January of 2010. The, his, he then turned on her and there was a devastating report, performance review in January of 2011. That was the end of the sexual invitation part of the relationship. What then happened became a relationship of anger and abuse that begins in February of 2011 and culminates, I submit a jury could find, with her termination in June of 2011. So let me tell you... Counsel Susan, I'm sorry, but I think it's important that you know what we're concerned about, hence the questions. That interview takes place in January and she describes what happened there and on summary judgment we have to accept as fact that her account is correct. But despite that, then many months later in May, she obviously decides to go forward in seeking the promotion and in May she in fact enters the working group that Mr. to do with that fact that despite her discomfort with that initial interview, she pursues the job and in fact becomes a member of this group in May and then other events take place. But what happened in January, should that factor into the hostile environment claim when she's seen by her to not factor what happened into her decision to pursue the new job? So she supplies us with an answer to that very question and where I would disagree is to say she did not factor it in. I think what she tells us is that her hopes for career advancement outweighed her trepidation. So what she tells us in her deposition is that first of all, she did not know that she would be directly reporting to Mr. Knackley. She was two levels above her in the reporting relationship, so she knew that her day-to-day report would be somebody different. She also didn't know how often she was going to be encountering him on a day-to-day basis. She was principally concerned with advancing her career. This was a dream job for her. It was what she had trained for back in China. It was an incredible opportunity and I think a jury could appreciate that a person a reasonable person in her position might look at that episode and say, oh my God, this was very shocking and frightening, but I need to seize this opportunity and do what I can and hope that things will work out in my favor. I don't think that's at all an unreasonable conclusion for a jury to reach on those facts. So we have the, let me tell you a little bit more about that episode, because I think it's very significant and it sets the tone for what ultimately, despite her best hopes and wishes, does turn out to be the tenor of their relationship. She applies for a posting that she sees in October of 2009, well before any performance review she receives in her then current position. Mr. Knackley contacts her in 2010. Rather than sitting down with her in an office to have a job interview about her qualifications and experience in performance, he invites her to a restaurant. And right from the outset, he directs... I'm sorry, was Mr. Knackley ever deposed? He was not, no. Ms. Tang was pro se and our record has a number of gaps in it here, questions that we all might like to see answered. I would suggest to you that... But David, though, doesn't deny the Thai girl conversation. It does not, no. And that's a very significant point. He does say that the discussion was entirely professional and he was principally concerned about what were her reasons for leaving her then current position in real estate. What he does not do is actually deny that he made any of these statements, and I think that's very significant. He had the right to deny it. Obviously, her information was in the record before him and he didn't. What then happened at that supposed interview was that she was shocked when he engaged in no discussion of her qualifications or experience at all. Now, I think the district judge may have viewed that conversation as consisting of friendly small talk. I don't deny that a reasonable juror might view it that way as well once it hears from the parties. But a reasonable juror could also look at it and say that that was a discussion that really crossed the line from boorish into actionable. The discussion, he began by asking her if she was married. He asked her if she had a boyfriend. He talked to her about where she could find a boyfriend. He immediately, in other words, what I'm trying to say is he immediately turned the conversation in a direction of intimate, personal, and sexual matters in a manner that was completely inappropriate to the setting that they were in. He then raised his interest in Asian women. He talked about his Thai girls. He talked about their immigration status. And then he made an overtly sexual comment by talking about how the Thai girls, how their bathing suits did not reveal enough of their bodies in the swimming pool. And I've cited a couple of cases, one in particular, two cases from other jurisdictions in which that involved that same concatenation of racial and sexual where it's clear that the racial element has sexual overtones for the perpetrator. In particular, there's a case from Arizona Voland that I've cited in my reply brief in which the supervisor referred to her as a China doll. He made comments about your people. And he made comments like Asian women are supposed to be submissive, identical to the comments we have in this case in the record. The same concatenation of you're an Asian woman and sexualizing her Asianness. And I wonder how the jury could interpret his comments. Counsel, accepting the proposition that these comments were sexual in nature and she was objectionable reasonable for her to so interpret them. And even acknowledging that they had a severe quality to them. What about pervasiveness, which is a distinct and important aspect of a hostile environment claim? There are two encounters that are described here. There's the interview and then there's the performance evaluation which takes place about a month after she takes the job. How do you get beyond a possible perception that those are two isolated instances and hence do not meet the pervasive requirement of a hostile environment claim? Two answers to that, Your Honor. First of all, it's a matter of law. The law does not require pervasiveness as an independent. Excuse me. May I finish answering the question? Yes. Does not require it as an independent element. It is severity or pervasiveness. And greater severity permits less pervasiveness and vice versa is also true. Are you sure that they're alternatives? They are. When conduct is more pervasive, less severe conduct will suffice. That is. And the opposite is true. And the second answer, factually, is that here what we do have is pervasiveness because she has testified, and her testimony must be taken as true, that there were ongoing incidents, including repeated staring at her body, comments about Thai girls, and importantly, invitations to come learn golf from him and also very importantly, invitations to his office, which she knew to be in his home in Connecticut, for no business purpose that was conveyed to her. I see that my time is up. If you have no further questions, I will thank the Court for your time. Thank you. Good morning, Mr. Batten. Good morning, Your Honor. May it please the Court, Mark Batten for Citizens Bank and David Batten. This case arises from an employee's subjective interpretation of a handful of objectively innocuous comments as demands for sex. Ms. Tang's supervisor mentions that he has two au pairs from Thailand, and Ms. Tang takes that as an instruction to, quote, get with his program of sex. Apparently... How can you... No, go ahead. No, go ahead. I just, how can, how can you, how can you characterize the comments that are made at the interview as objectively innocuous? They have nothing, absolutely nothing to do with the job interview, and there is a repetitive sexual theme or innuendo to those comments. How can you characterize those as objectively innocuous? Your Honor... And I would just want to put a tag on to that. Our obligation at this point is to look at the evidence and the like most favorable? Absolutely. Okay. And so it wasn't just, her allegation is not simply that he mentioned for whatever reason that he had two Thai au pairs, but he talked about obedience and bathing suits and skin exposure. Well, Your Honor... Which he doesn't specifically deny in his affidavit. He only says he kept it at a professional level, and professional certainly can be in the eye of the beholder. Well, as to the last point, Your Honor, to deny that statements were made would only create issues of fact at summary judgment. So that wouldn't necessarily have helped this situation with legal issues presented to the court today in any event. But with respect to the larger question, the first thing is that we have to determine what exactly is the relevant testimony, because Ms. Tang's version of that lunch meeting evolves over time. When she's deposed, she has a very narrow discussion about what exactly he said about Thai au pairs, which by the time of her affidavit, her 50-page response to our brief and her separate affidavit that comes in months later, she spent a lot more time developing new facts that she did not testify about in her deposition. Does that make any difference as far as whether summary judgment should consider them or not? It makes all the difference, Your Honor, because Isn't that, aren't you pointing at credibility? No, sir. What are you pointing at? I'm pointing at the case law that says that a plaintiff cannot create an issue of material fact by changing her testimony and developing conflicts in that evidence along the way. We have to accept the evidence that she puts forth in the first point. She's deposed for two full days. She has ample opportunity to say what happened at the lunch. We hear nothing about revealing swimsuits in that account. This is something that she comes up with later. And incidentally, what you see in the affidavit that comes in much later in the case is that apparently Mr. Nackley was so uncreative about his comments that he says exactly the same thing every time. The revealing swimsuit by the end of the case, when she submitted all of her evidence, was in July 2010, in interim points. He's constantly talking about bathing suits. Counselor, you are arguing credibility. She's not arguing that she should survive summary judgment because she created some genuine issue of material fact. You're suggesting that there were some inconsistencies, perhaps in the deposition and affidavit. And on that basis, you're arguing that her account should not be taken seriously. You're making a very credibility argument, just the way it says you're making. No, Your Honor. What I'm saying is that having testified at length about what happened in the meeting in her deposition, she cannot then, and I would say presenting testimony about what happened that does not add up to an objectively offensive description, she can't then correct the error in a document that we have no opportunity to cross-examine her on by submitting a fulsome affidavit later on. And thereby creating a genuine issue of fact by presenting a much different account of a meeting that she's already testified about at length. That's not appropriate. What was this meeting about? The meeting was a job interview, Your Honor. And why did it take place in a restaurant? The restaurant was right across the street from the office. Now, did I read somewhere that this restaurant, having meetings there, had a sexual connotation to it? What you read, Your Honor, was that Ms. Tang says with no elaboration, no other evidence, just a bald statement, this restaurant is known for dating. Well, assuming that that's the case, what are we supposed to do with her statement? What kind of weight do we give that statement in a summary judgment picture? Summary judgment evidence has to be admissible. And a statement about the general reputation of a restaurant with no foundation, no explanation on the basis of her knowledge would not be admissible. So it ought to be ignored, Your Honor. Why would it not be admissible if it's stated by someone who apparently seems to have knowledge of the fact? We don't know that she has knowledge of the fact. Well, we don't know if she doesn't. We have to accept that someone is speaking from knowledge. No, Your Honor. She has to demonstrate through that she has admissible evidence on that point. And making a bald statement doesn't show that she has admissible evidence. But there's a difference between her stating that in a deposition and not being asked to elaborate as to why she says that. But you're taking her deposition, right? I'm sorry? You're taking her deposition. That's correct. So you're asking her only what you're interested in knowing. Well, Your Honor, the transcript is in the record. Your Honor can review it. And the questions were open-ended. She had full opportunity to testify about what happened. And all these details that Your Honors are now citing to me are all things that she declined to say at the time, given ample opportunity to do so. And so we're presented with one set of facts, which don't add up, respectfully, to a case for a jury about sexual harassment at that lunch. And then we're presented at summary judgment with a lengthy affidavit that describes much more that we've never seen before. That's not appropriate. We have no opportunity to challenge that information. But, counsel, your opponent has said that it would be a mistake to view the encounters between the appellant here and your client, or Mr. Knackley, as limited to the initial interview and then the performance review. In fact, they had ongoing contact. And in that situation of ongoing contacts, he would leer at her, make comments similar to those he made in those other two encounters. Isn't it your position that there is nothing in the record to support that insistence that there were these ongoing encounters between the two? She testifies that those encounters continued. And so that is in the record. In the deposition? I don't believe it's in the deposition, Your Honor, but I may be wrong about that. So it would be in the affidavit, then? Yes. And you're telling us that we should disregard the affidavit? Yes. But even if you don't, Your Honor, even if you accept the affidavit as it stands, we're still talking about whether it happened on more than one occasion or not. And appellant's counsel this morning was not vigorous about pervasiveness. Well, it's severe or pervasive. As counsel said, they are... It's a case loss. I wrote one of those cases, and I know it's a severe or because that was the issue in the case I wrote. Yes, Your Honor. Although if the incidents lack severity, I hope you would agree, more pervasiveness is required. I do agree. That's all we're saying. And so here, whether there were multiple incidents or only a few, the actual incidents themselves were not terribly severe. They don't rise to the level that a reasonable jury could find that a reasonable person would have found this conduct offensive of a sexual nature or... So if someone is leering at you, and then there was the incident with the play on the word assume, which she also says was accompanied by sexual gesturing... What he said was, when you assume, you make an ass out of you and me. But she said more than that happened. She said that he said, this is my ass, this is your ass. And she said it was accompanied by sexual gesturing, coupling gesturing. We don't know what that means. That's right, Your Honor. She did say that. But to be an ass, there's nothing sexual about that. It depends on the context, doesn't it? It does depend on the context, yes. But this was a context of a performance meeting when he's talking about making assumptions. And she concludes from that that he therefore wants to have sex with her. But you're interpreting. No, Your Honor, I'm not. She's interpreting, and that's the problem. It's her subjective interpretation that is driving this case. But I was saying, the question is whether it can objectively be interpreted that way also. And perhaps if it was just the words, but once again, it's the words accompanied by what she said was sexual gesturing. It still doesn't add up, Your Honor. It's still talking about there's no invitation, there's no suggestion that there needs to be a sexual relationship. It's these very, really innocuous comments are all she has to cite to. And then everything else becomes a product of her interpretation, her subjective interpretation, but not something that an objective, reasonable person would find to be offensive. Why shouldn't she have an opportunity to describe what happened, how she experienced it, how she viewed it to a jury? And then a jury can decide whether her reaction is objectively reasonable. Because the court has a function initially. That's right. It's been exercised in the Ponte case, and the Fontana-Nunez case, and many others, to say this has to get to a certain threshold. Yeah, but what would permit, what would prevent a, why should a judge conclude that no reasonable jury on this evidence could conclude that her reaction to what was happening to her was objectively reasonable? I mean, her experience of it as a sexual advance. What would prevent a reasonable jury from drawing that conclusion? The comments that are alleged actually to have been made, distinguished from her interpretation of them, are extremely mild. Mr. Knapley asks her about a conflict of interest, and she says, I thought the world was coming to an end. It's an excellent example of an absolutely appropriate inquiry met by an extreme, extravagant reaction on her part. That's the kind of, that's what's presented in this case, is a handful of remarks. The closest we get to anything sexual is the comment about swimsuits, which only gets converted into a demand for sex because of Ms. Tang's... But he has, but she says, he has had this unnatural interest in who she is dating, and now his continued interest in that, and the fact that it may be somebody who might pose a conflict of interest, is really not about a conflict of interest. It's just a continuation of that unnatural interest that is in who she's dating. I mean, that's her version. Well, again, it's her interpretation, Your Honor, of events that don't support that interpretation on an objective basis. You say a continuing interest in who she's dating, but all we have in that regard is apparently a question about a boyfriend in January of 2010, and then a report from one of Knapley's other subordinates that she's dating a client of the bank. And Mr. Knapley and the human resources representative together pose that inquiry. Because Mr. Knapley doesn't know who it is, the record shows that all he's told by the other subordinate is, she's dating a client. So he calls her in, he gets human resources on the phone, and says, who is this? We need to investigate this. Assuming she's to be believed, this interest in who she was dating, according to her, comes up at the very first meeting, in addition to, she's to believe an inquiry as to whether she knows what websites to use to find boyfriends. Again, Your Honor, that's not her testimony. This website thing appears much later in the day, much later in the case, as a new invention that we've never heard anything else about anywhere in the case. What we have from her testimony when she's asked in person, what did he say? She doesn't even remember. He may have made a comment about a boyfriend, or he may have asked me a question about a boyfriend. I really don't remember. That's her testimony. And then suddenly in an affidavit, we've got, here's exactly what he said. It was a question about boyfriends, it was websites where I could find a boyfriend, dot, dot, dot. Suddenly developing a memory, a precise memory, that she denied having in her deposition. That's exactly what this law is about, that you can't create genuine issues of fact by contradicting yourself. Either she has a memory or she doesn't. She didn't in her deposition, and months later, she suddenly got a memory that supports all kinds of extreme interpretations of things that were said that she can't come up with when she's asked to her face. That's the problem. So you're saying that there is a rule of law that supports a proposition that the affidavit that she submitted subsequent to the deposition cannot be factored into the summary judgment analysis? Is that your... That's a broad statement, Your Honor. What I'm saying is she can't contradict her prior lack of memory. What about supplement? Well, supplementing, saying I have no memory of that and then saying I do have a memory of that is a contradiction, not a supplementation. And the conflict of interest question not only was legitimate, but then actually resulted in some rules being established that she not be assigned to certain accounts and she be kept away from this to ensure that there was no conflict of interest in her working on the account that her former boyfriend had been working on. There's no suggestion, there's nothing in the record to support the idea that Mr. Knackley was doing this on a bar or for his own personal interest. Well, her brief, though, says something to the contrary which is that Mr. Knackley knew all along who she was dating and that this was no new news to him and it wasn't until a later date that he decided to make it an issue. At least in her brief. And I urge you to check the record site that the brief refers to because what Ms. Tang says is Knackley knew about this before. That's the extent of the specificity. So what he may have known about... We don't know how much longer before. She doesn't say months and months before which is the representation in the brief. What he knew about it before but doesn't say that he knew the name, doesn't say that he knew the company and it's perfectly consistent with his own testimony about what he learned from the subordinate that required some further inquiry to get the details. That's all. Thank you.